7456

STATE v. LLOYD.

1. INSANITY.—From the charge the jury must have understood the Court to mean that the defendant was not to be held responsible if, at the time the act under investigation was committed, he was so mentally unsound as not to know such act was wrong, and if insane to that extent he was as irresponsible as an infant.

2. IBID.—The Court here properly applied the test knowledge of right and wrong to the act committed by defendant and not to his general conduct.

3. IBID.—That a defendant in a criminal case knows right from wrong but is incapacitated from choosing between them on account of mental unsoundness will not relieve him of responsibility for crime.

Before DeVore, J., Greenwood, June term, 1909. Affirmed.

Indictment against L. A. Lloyd for murder, defendant appeals from sentence on verdict of manslaughter.

*Messrs. Giles* and *Ouzts,* for appellant, cite: *Insanity relieves of responsibility for crime:* 24 S. C., 445; 30 S. C., 16; 39 S. C., 97.

*Solicitor R. A. Cooper,* contra.

February 23, 1910. The opinion of the Court was delivered by

MR. CHIEF JUSTICE JONES. The defendant was tried upon an indictment for murder, and was convicted of manslaughter, and was sentenced to the penitentiary for a term of ten years.

The testimony is thus stated in the case for appeal.

"The evidence shows that the defendant's wife had sold a plantation to the deceased some time in the fall of 1908, and that the deceased was to get possession, and the defendant was to surrender possession January 1, 1909. In the

meantime, the defendant had given the deceased permission to sow grain on the place and do other work which would not intefere with the defendant in gathering his crops and moving off the place.

"The deceased commenced to build to a house in the yard of the defendant, and to use water from the well in the yard which the defendant used for domestic purposes. The well was used with two buckets, as one descended into the well the other ascended, and the ascending bucket was fastened on the side of the curbing by a contrivance which prevented the descending bucket from muddying the water. When the brick mason commenced to use water from the well, the defendant instructed him how to secure the bucket to prevent muddying the water; he disregarded these instructions, and he was forbidden to use the water at all, and to prevent the use a top was nailed down on the top of the well. When the matter was reported to the deceased, he came from his residence, a short distance of a half mile, and tore off the top of the well and proceeded to use the water over the protest of the defendant, and during the altercation the defendant testified that the deceased caught hold of him and shoved him back into the opening of the well, and threatened to push him in, and in this position he shot deceased with a pistol.

"There was no one present but the brother of the deceased and his employees. The deceased was a stout man of about 40 years of age, the defendant was a very feeble man of 65 years of age. It was shown that the defendant had been wounded in the war, and had his leg broken in a runaway many years ago, and that defendant had contracted the habit of taking morphine and other narcotics to excess. That for several weeks prior to the homicide he had been taking a cure, and that he was very feeble and nervous. That on the day of the homicide he had taken the last dose of the cure, and every member of his family had gone to Greenwood, five miles distant, and were to bring morphine

to him on their return, but the homicide occurred while they were away.

"The expert testimony which was introduced by the defendant on the trial tended to show that a person who has been taking morphine continually for a number of years until he has become a habitue, when he was out or the drug had been withdrawn from him, became very nervous, and some testified that a person would be under such conditions a maniac, not responsible for his actions."

The first exception relates to the response of the Court to defendant's fifth request to charge, and assigns error in so much of the following charge as is enclosed within brackets:

5. "The defendant is presumed by law to be sane. This presumption can be removed by the defendant, and if the evidence of unsoundness of mind preponderates, the defendant is entitled to an acquittal."

"I charge you that, Mr. Foreman and gentlemen, and in that connection this, as I have charged you; that (the test is whether a man's mind is so impaired, so much deranged, as to place him in a condition so as not to be able to know right from wrong at the time that the act was committed, that he is charged with having committed. If a man is insane, why he is no more than an infant; he is not responsible any more than an infant, in the eyes of the law). On the other hand, if, at the time he committed the act that he is charged with having committed, he knew right from wrong, either legal wrong or moral wrong, why the law says he is responsible, so far as the plea of insanity is concerned."

The specification of error is: "That a man may be insane on a single subject, and not know right from wrong as to that particular subject, yet be perfectly sane on all other subjects, and the illustration used by his Honor of an infant conveyed to the jury the idea that in order for insanity to be a defense, the defendant would have to be as an infant

without any knowledge at all, the mind would have to be blank, not capable of reasoning on any subject."

The exception clearly misinterprets the meaning of the Court. The previous charge to which reference was made was as follows:

"In regard to the defense of insanity, I charge you, in the language of our Supreme Court: In order to relieve a party from responsibility for a criminal act by reason of mental unsoundness, the party must show that he was under a mental delusion by reason of mental disease, and that at the time of the act he did not know that the act he committed was wrong or criminal, or punishable, either the one or the other; for, notwithstanding his mind may be diseased, if he is still capable of forming a correct judgment as to the nature of the act, as to his being morally or legally wrong, he is still responsible for his act, and punishable as if no mental disease existed at all.

"That is the law, as I understand it, Mr. Foreman, in this State; that, although a person may be a habitual morphine eater, or any kind of opiate eater, and his mind may become impaired or deranged or beclouded or diseased, and yet if he commits an act which he knows at the time to be wrong— knows at the time that it is morally wrong or legally wrong —why, the law would hold him responsible."

It is thus manifest that the jury must have understood the Court to mean that the defendant was not to be held responsible, if, at the time the act under investigation was committed, he was so mentally unsound as not to know that such act was wrong, and that if insane to that extent he was as irresponsible as an infant.

The second exception relates to the response of the Court to defendant's eight request as follows:

8. "If the jury believe that the defendant was laboring under a delusion caused by unsoundness of mind, when he

committed the homicide, and that he killed the deceased, while acting, as he thought, in self-defense, supposing that the deceased was attempting to take his life or inflict great bodily harm, the jury must acquit, although the danger was imaginary."

"Instead of charging you that, I charge you this—I refuse to charge you that as it is written. I charge you this: That if the jury believe that the defendant was in such a state of mind on account of its derangement or impairment, as to render him incapable of knowing the distinction between right and wrong, at the time he committed this act, that then he would not be responsible. If, on the other hand, he knew the difference between right and wrong, at the time he committed this act, the law imposes upon him the burden of refraining from doing this wrong."

The specification of error is: "That the knowledge of right from wrong should have been applied by his Honor to the act committed by the defendant at the time, and not to the knowledge of right from wrong generally, because the defendant might know right from wrong as to certain subjects and be unable to distinguish right from wrong as to others."

What has been said as to the first exception shows that the Court applied the test-knowledge of right and wrong— with respect to the act committed by the defendant.

The third exception is as follows:

3. "His Honor committed error of law in refusing to charge the jury the 12th request of the defendant, which was as follows:

" 'If the jury find from the evidence that the defendant was of unsound mind caused by excessive use of alcholic stimulants or drugs, and that the unsoundness of mind was of such a degree, at the time of the homicide, that the defendant could not choose between right and wrong, although he knew right from wrong, in the abstract yet was without the power to choose right from wrong, they must

6—85

find a verdict of not guilty;' the error being that the request was a sound proposition of law, and should have been charged as requested."

The request was properly refused as it was in conflict with the rule as declared in *State* v. *Bundy,* 24 S. C., 445; and *State* v. *Alexander,* 30 S. C., 84, 8 S. E., 440; and *State* v. *McIntosh,* 39 S. C., 108, 17 S. E., 446. The jury were instructed in accordance with the law in this State.

The judgment of the Circuit Court is affirmed.